## SMITH VS. SCOTT.

CONTRACTS.   *Construction of contracts —Parol evidence to explain.—Lien.— Waiver of lien.—Loss of lien by delay.—Sale of property subject to lien; when more may be sold than required to pay amount due.*

1. By a contract made in the fall of 1868, plaintiff sold to defendant the undivided half of all the pine timber which would make good merchantable lumber, situated on certain lands; and the defendant was to pay therefor one dollar per M., scale measure, in the log.   Defendant further agreed to fit out, man and equip a sufficient number of teams to cut, haul and bank at least 2,200 M. (the amount estimated by plaintiff to be upon said lands) during the lumbering season of 1868-9, and to "haul, cut, run and deliver" in the Wolf river for plaintiff the undivided half belonging to plaintiff.   Another clause stated that defendant was to "fit out teams sufficient to bank said timber *in an ordinarily good lumbering season,*" etc.   It was further provided that defendant should have a *lien* upon the plaintiff's half of the logs so cut, etc., to secure the payment to him of a certain agreed price per M. for cutting and handling them; and that all timber on said lands not cut during the then next lumbering season should be cut and run the season following, upon the same terms above named.   *Held*, that defendant did not lose his lien upon plain-

tiff's half of the timber cut during the season of 1868–9, merely because he did not then cut and haul the whole quantity named, even if plaintiff was entitled to recover damages for such failure, and to have the amount thereof deducted from the amount for which defendant claimed a lien.

2. Where a lien on chattels is given *by operation of law*, a voluntary surrender of the possession is a *waiver* of the lien.

3. The lien here was given also by the contract, which further provided: (1.) That plaintiff might sell his undivided half of the logs at any time, "subject to the liens and claims" of defendant, the amount of which must be paid by plaintiff before defendant should be bound to deliver the logs, and upon such payment being made, defendant was to deliver plaintiff's half to plaintiff or his assigns. (2.) That after the logs were "rafted and ready to be delivered and paid for," they should be "divided by rafts equal in quality and quantity, each party to have an equal amount of said logs." (3.) That if plaintiff should not pay defendant the sums due him when plaintiff's logs were ready for delivery, defendant should hold said logs for three weeks after notice in writing given plaintiff, and if such sums were not then paid, defendant was "authorized to sell a sufficient amount to pay" the amount due him. *Held*, that defendant's lien was not lost or waived by the mere division of the logs into two equal parts, nor by any other act short of a voluntary surrender of the possession by defendant, *with the intention* of discharging the lien; and the evidence in this case does not show any such surrender.

4. The logs cut and hauled under the contract consisted of two lots called the L. and the S. logs; and the defendant afterwards agreed in writing to take the plaintiff's half of the L. logs at a specified price per M., and apply the amount on the sum due him on said contract. To this agreement was added the following, signed by defendant: "The amount due F. H. S. (the plaintiff) upon the above L. logs, sold to me for $9 per M., as above stated, is hereby applied in payment according to said contract on the S. logs." *Held*, that only the *remainder* of the agreed price of said L. logs, *after deducting the amount of defendant's charges for cutting and hauling them*, was to be applied in payment of his charges against the S. logs, and he still retained his lien upon the latter for any balance which then remained unpaid.

5. There is no ambiguity in the last named contract, and parol evidence was not admissible to explain it.

6. Plaintiff having neglected to pay the balance of defendant's claims for three weeks after notice thereof given in October, 1869, defendant then advertised a public sale of a portion thereof to pay his lien, but could get no satisfactory bid. He then tried to sell them at private

sale, but could not do so until the next March. It does not appear that he was wanting in diligence, or that plaintiff sustained any loss from the delay. *Held*, that defendant did not lose his lien by delay in enforcing it.

7. Where the usual way of selling logs in the market was *in rafts*, and two rafts would bring less and three more than defendant's demand, he might sell the third raft without being liable as for *a conversion* of the logs.

APPEAL from the Circuit Court for *Winnebago* County.

Action for a conversion of logs. In October, 1868, the plaintiff and defendant entered into a written agreement, by the terms of which *Smith* "sells to said *Scott* the undivided one half of all the pine timber which will make good, merchantable lumber, both standing and lying" on certain described lands situate partly in a certain section 3, and partly in a certain section 2, in different townships in Shawano county. For said timber *Scott* agreed to pay *Smith* "one dollar per thousand feet, scale measure in the log," which sum was to be paid "as hereinafter named." The contract then provides, as follows: "Said *Scott* agrees to fit out, man and equip a sufficient number of teams to cut, haul and bank at least 1,200,000 feet of timber, scale measure above described, on the above described lands on section 3, and 1,000,000 feet on the lands in section 2, both the undivided half hereby sold to him, and the remaining undivided half, the coming lumbering season of 1868 and 1869, of which remaining undivided half said *Smith* is the owner, and which said undivided half said *Scott* hereby agrees to haul, cut, run and deliver for said *Smith* as herein stated; * * provided, further, that said *Scott* is to fit out teams sufficient to bank said timber in an ordinary good lumbering season both as to the length of said season and the quantity of snow, and the quality of sledding. And said *Scott* is to put said teams, well manned and equipped, into the woods upon said lands as early as practicable, and continue them as long as good sledding continues, and cut, haul and bank all of said timber which can be done with said teams, manned and equip-

ped as aforesaid. * * Said *Scott* further agrees to run all of said logs, so cut and banked, in the spring of 1869, into Wolf river, within the limits of the Wolf River Boom Company's charter, provided there shall be a sufficient stage of water to run the same."

By the next clause of the contract, " *Smith* agrees to pay said *Scott* * * for cutting, hauling, banking and running into Wolf river as aforesaid his [*Smith's*] undivided half of said logs," a certain amount per thousand feet for the logs cut from section 3, and a certain other amount per thousand feet for those cut from section 2 ; and as to the time and manner of such payment the following provisions are made : " The said Wolf River Boom Company are to run said logs from where *Scott* leaves them under his contract, and raft them ; and as soon as said logs shall be all rafted, they shall be scaled, and said *Smith* shall deduct from the price going to said *Scott* for cutting and running his [*Smith's*] half of said logs, one dollar per thousand feet for said *Scott's* half of said logs, the amount agreed upon as above, according to said scale, which amount shall be applied in payment of the amount due to said *Scott ;* and the balance of the entire amount shall be paid by said *Smith* to said *Scott* as soon as the said logs shall be scaled as aforesaid and ready to be delivered. It is hereby futher agreed between said *Scott* and *Smith* that each party is to be the owner absolutely of one undivided half of all of said logs cut and run as aforesaid, subject only to the liens and claims as provided in this contract."

There is a further provision that *Smith* " may sell his undivided half of said logs, or interest in the same, at any time he deems advisable, subject to the liens and claims of said *Scott.* " The contract then provides that after the logs are all rafted and ready to be delivered and paid for, they " shall be divided by rafts equal in quality and quantity, each party having an equal amount of said logs ; " that *Scott* shall have a lien upon all the logs, and may retain them in his possession until he shall be

paid in full for all sums that may be due him on the contract for cutting and running *Smith's* half of the logs, and for all other expenses incurred by *Scott* on said logs under the contract; that if *Smith* shall not pay *Scott* the sums so due the latter, at the time when the logs are ready for delivery, *Scott* shall hold the logs for three weeks after notice in writing shall be given to *Smith;* and that if such sums are not then paid, *Scott* shall be authorized to sell, "for the highest market price that can be got" for them, a sufficient amount of said logs to pay such sums, and apply the proceeds in payment thereof. There is a further agreement that *Scott* shall pay and advance the boom company's charges for running and rafting the logs, and all other charges upon the same until they shall be sold, and that *Smith* shall repay him one half of the amount so advanced, at the same time and in the same manner as the sums due for cutting and banking the logs are required to be paid. And finally the contract provides that "all timber on said lands not cut the coming lumbering season, shall be cut and run the next succeeding season, upon the same terms and in the same manner as the timber the coming season."

This action was brought by *Smith* to recover for an alleged conversion by *Scott* of 201,174 feet of logs cut by the latter in the lumbering season of 1868–69, on section 2 above mentioned, and hauled, banked and rafted in the manner described in the contract; which logs are alleged to have been the property of the plaintiff. The answer, after a general denial, recites the provisions of the aforesaid contract, and avers that defendant fully complied with all the conditions and covenants thereof on his part; that the logs got off from section 3 were sold, by mutual agreement of the parties, and accounted for; that the balance of the logs were taken to the city of Oshkosh, duly rafted, etc.; that thereupon the parties agreed what rafts should belong to each of them, the plaintiff's share being seven rafts and a crib, that at that time (about October 1, 1869) plaintiff was indebted to defendant, under the contract in, the sum of $1,180, for which

defendant had a lien upon said logs of plaintiff; that plaintiff, being duly notified of the amount so due, was not prepared to pay it; that on or about the 25th of October, 1869, a written notice was served on plaintiff, that the logs were ready for delivery on payment to defendant of the charges thereon as provided by the contract, and that, if the same were not paid, defendant would proceed to sell a sufficient quantity, etc.; that plaintiff did not at any time pay, or offer to pay, any part of said charges; that in the winter of 1870, defendant offered said logs for sale at public auction, after giving due notice, but could not get any satisfactory bids therefor, the highest bid offered being $5.50 per thousand feet; that in March, 1870, he sold 201,174 feet of said logs to one Mowry, at private sale, for $7.00 per thousand, etc.; that this was the highest price defendant could get for them, and the highest market price at that time in Oshkosh or its vicinity; and that these are the logs referred to in the complaint.

On the trial, the defendant testified that he had got out a few thousand less than 1,000,000 feet of logs from section 2, and 857,620 feet from section 3, in the lumbering season of 1868–69. In other respects the evidence for the defense tended to sustain the averments of the answer. It appearing that the defendant sold three rafts of plaintiff's logs for over $1400, while the amount for which he claimed a lien was only $1176.79, he introduced evidence tending to show that logs were usually bought and sold in that market by rafts.

The plaintiff's rebutting evidence showed that immediately after the logs cut upon section 2 were divided by rafts, and the portion which should belong to each party determined, the plaintiff left an agent in charge of the logs assigned to him, and a few days after caused the same to be removed. One Scutt, a witness for plaintiff, testified that a day or two before the division of the logs, having had a conversation with *Smith's* agent about purchasing the logs belonging to *Smith*, he went to *Scott* to inquire about such purchase, and *Scott* told him that if

he (witness) bought *Smith's* logs it would be all right, and there would be no trouble about it; and also told him that there were "no liens upon the logs." Defendant, on being subsequently recalled, testified that he never made any such statement.

The plaintiff offered to prove by a witness that there yet remained on the lands specified in the contract, a large amount of pine timber (about 1,100,000 feet), such as was contemplated to be cut under the contract; and that, after getting out the logs which were gotten out in the winter of 1868–69, defendant abandoned the contract, and plaintiff had been compelled to let, and had let, contracts for getting out the remaining portions of the timber upon said lands, at prices exceeding those agreed upon in the contract with defendant. This evidence was offered for the purpose of showing "that defendant had lost any lien which he might claim under and by virtue of the contract" with him. The court refused to admit the evidence for that purpose, but stated that it would be admitted for the purpose of showing the damages which plaintiff had sustained in consequence of defendant's nonperformance of the contract, and of setting off that amount against the sum for which the defendant claimed a lien. There being another action pending at that time for the recovery of such damages, the plaintiff declined to introduce the evidence for the purpose last named. Plaintiff then introduced, without objection, evidence tending to show that the lumbering season of 1868–69 was at least an ordinarily good season, in respect to its length, the quantity of the snow, and the quality of the sledding.

It appears that the logs cut on section 2 were called the "Shioc" logs, while those cut on section 3 were known as the "Mud Lake" or "Shawano",logs. One William Smith, who acted throughout the whole transaction as agent of the plaintiff, testified that in October, 1869, the defendant served on him two bills of charges, etc., on the two lots of logs severally; and these bills were put in evidence. The first is entitled "Account

of *R. M. Scott* against *F. H. Smith*, on account of cutting, running rafting and other expenses on Shioc logs, for payment of which he claims to hold said logs under contract dated October 22, 1868." The debits foot up $2964.34; the principal item of credit is "by balance due on Shawano logs, $1,254.56;" and there are other items making the aggregate credit, $1,787.55; and the "balance due *Scott*" is stated at $1,176.79. The second paper is entitled "Account of *R. M. Scott* against *F. H. Smith* on the Shawano logs, under contract dated October 22, 1868." The debits amount to $3,033.54; there is a credit "by 428,810 feet logs at $9.00, $3,859.29;" and another "by stumpage on same at $1.00, $428.81;" making a total credit of $4,288.10; and the "balance due *F. H. Smith*" is stated at $1,254.56. The witness then stated that the Mud Lake logs were sold, and the proceeds were paid to *Scott*, under an arrangement indicated by the following written agreement, which was also put in evidence:

"MENASHA, September 27, 1869.

"I agree to take *F. H. Smith's* Mud Lake logs of him at $9 per thousand, it being one half the amount of logs put in by *R. M. Scott* the past winter on Mud Lake, and apply the amount on moneys due me on contract for putting in logs on Mud Lake and Shioc river. R. M. SCOTT."

"The amount due *F. H. Smith* on the above Mud Lake logs sold to me for $9 per M. feet as above stated, is hereby applied in payment according to said contract, on the logs cut on section 2 [adding town and range.] R. M. SCOTT."

The witness then, without objection, testified that previous to the execution of the above paper, he had made a bargain with one Doe to sell him plaintiff's Mud Lake logs for $9 per M. in cash, at which price they would amount to $3,859.29. " *Scott* wanted to get that money. I told him I would let him have these logs so he could give Doe the title, in case he would release the Shioc logs, and to apply on the Shioc logs. He handed me the paper, this *upper* paper. I told him I

shouldn't take it that way. Then he told me to write it just as I wanted it. I wrote the *lower* portion of it, and then he signed it. Then *Scott* took my bargain with Doe, and received the $3,859.29." *Question:* " What was to be done with the section 2 logs ? " *Answer :* " *F. H. Smith* and *Scott* were to divide them, of course, and each to do with them as he had a mind to." The witness further stated that after the division of the logs cut from section 2, he had one McNair put marks on the rafts belonging to the plaintiff, to distinguish them, and told McNair to deliver them that day to Tolman & Harris, who had previously concluded to saw them ; that nothing was done with them that day on account of its blowing so hard ; but that on the next morning they were taken to Tolman & Harris's mill by witness's order. On cross-examination, the witness repeated that when the Mud Lake logs were sold to defendant, what was coming to plaintiff " was to be applied on the Shioc logs." The defendant, being called by his own counsel, was asked to state whether, at the time he made the arrangement about the Mud Lake logs, or at any other time, he told Mr. Smith that he could take his share of the Shioc logs after the division of them, and do with them as he had a mind to; and he answered that he never did.

The court gave the following instructions asked by the plaintiff : 1. That if the parties made a division of the logs, and each, with the other's knowledge and consent, after such division, took possession of his own, the defendant by this act surrendered his possession of the logs, and thus relinquished his lien, if he had any; and if he subsequently took the logs from plaintiff's possession, and converted them to his own use, plaintiff was entitled to recover. 2. That if defendant received payment for cutting, hauling and running the logs in dispute, he had no lien on them, and his taking was tortious. 3. That if the parties agreed that defendant should have the Mud Lake logs or the avails thereof, and that the Shioc logs should be divided, and each party, after the division, should take his por-

tion, and if such division was made in pursuance of that agreement, and if, after such division and after plaintiff had taken possession of the logs in dispute, defendant took and converted them to his own use, then plaintiff was entitled to recover.

The plaintiff also asked the following instructions, which were refused: 1. That if the defendant had failed substantially to perform his part of the contract set out in the answer, no lien on the logs existed in his favor, and plaintiff ought to recover. 2. That the contract of defendant to apply the amount due plaintiff upon the Mud Lake logs sold to defendant, being for a greater amount than defendant's lien on the Shioc logs, plaintiff was entitled to a verdict. 3. That if defendant sold more logs than was necessary to make the amount of his lien on the logs (if he had any), and had not offered to pay back to plaintiff the surplus, plaintiff was entitled to a verdict. 4. That if the sale was made at private and not at public auction, it was unauthorized by the contract, and was a conversion of the logs.

The court further instructed the jury, among other things, as follows: 1. That defendant did not lose his lien on plaintiff's logs by reason of his failure to cut the quantity of timber named in the contract. 2. That under the written agreement for the purchase and sale of plaintiff's section 3 or Mud Lake logs, defendant was entitled to apply the price thereof first to the discharge of his claims for cutting, etc., said logs, and expenses paid thereon; that only the remainder of such price was appliable to the charges against the section 2 or Shioc logs; and that he did not release by that agreement his lien upon these logs for so much of his charges as then remained unpaid. 3. That the division of the logs by the parties did not discharge defendant's lien, but that the jury were to determine upon the whole evidence, whether, prior to the sale by defendant of the logs in dispute, there was an agreement between the parties that his lien upon them was released and discharged. 4. That if they found that this kind of property was ordinarily sold in rafts, then, if two rafts were insufficient to

pay the whole amount for which defendant had a lien, he had a right to sell the third raft, and any excess in the amount for which such sale was made could not be recovered in this action.

Verdict and judgment for defendant; and plaintiff appealed.

*Gillet & Taylor*, for appellant:

1. If the contract was not fully performed by defendant, he could not have recovered in an action brought thereon. How then could he be protected in a sale of plaintiff's property to pay a debt which he could not recover in an action against the plaintiff? The rule which seems to have been adopted in this state and some others is, that where one has done work and furnished material under a special contract, but has not fully performed the contract on his part, if the opposite party has received the materials upon which the work has been performed, and has derived benefit therefrom, an action may be maintained against him on a *quantum meruit*, he being allowed to recoup any damages he has sustained from the non-performance of the contract. 18 Wis., 418; 6 id., 363; 11 id., 107; 7 Pick., 181; 8 id., 178; 1 Gray, 282; *Cutler v. Powell*, 2 Smith's L. C. All these cases, however, expressly hold that no action can, under such circumstances, be maintained on the contract itself. 2. The written contract between the parties as to the sale of the Mud Lake logs, when connected with the evidence of William Smith (received without objection) shows a release by defendant of his lien on the Shioc logs. 3. Where a lien is given by law, and not by express contract, a voluntary surrender of the possession to the owner is a waver of the lien. 10 Allen, 360; 15 Mass., 389; 6 East, 27; *United States v. Barry*, 3 Am. Law J., 128; *Jordan v. James*, 5 Ham., 88. And in case of a lien given by a contract which authorizes the person claiming the lien to hold possession of the property until his lien is paid, and to sell such property to satisfy the lien, the voluntary surrender of possession to the owner is clearly *prima facie* evidence of a waiver or abandonment of the lien. The charge of the court on this point was such as to create an impression

in the minds of the jury that the defendant could waive his lien only by an express agreement to that effect. 4. The defendant's right to sell any part of the property to satisfy his lien was derived entirely from the provisions of the contract (3 Eng. C. L., 154; 54 id., 378; 11 Barb., 41; 2 Kent's Com., 887), and must be strictly pursued. He had no right, therefore, to sell any more logs than would bring the amount of his claim, unless there was something in the nature or condition of the property which rendered the sale of a larger quantity *necessary;* and there was no proof of such necessity. Mere proof that logs are *usually* sold in rafts was not sufficient.

*Gabe Bouck,* for respondent.

COLE, J. The counsel for the plaintiff insists that if the defendant failed to perform the contract on his part, then he would not be entitled to his lien upon such logs as he did cut and raft under it; in other words, that a full performance of the contract by the defendant was an essential condition to his having a lien. We do not so understand the terms of the contract. Manifestly it was not the intention of the parties that all the logs mentioned in the contract were to be cut and rafted together. The defendant was to have two lumber seasons within which to cut and run the timber. And of all the logs cut, banked and run, each party was to be the owner of an undivided half, subject to the liens and claims provided in the contract. But if it was found impracticable, by reason of the shortness of the lumbering season, or failure of snow, or quality of the sledding, to perform the contract the first season, then the defendant was to have the next to perform it in; but he was to have his lien upon such logs as he might be able to get out, at all events. In the fall of 1869 he had a valid and subsisting lien upon the logs which he sold the next spring. The plaintiff offered to show that the defendant had not fully performed his contract, for the purpose of entirely defeating the lien. The court ruled that any damages the plaintiff could

show that he had suffered in consequence of the nonperformance of the contract by the defendant, he might recoup from the defendant's claim, but that the defendant did not forfeit his lien entirely by reason of his failure to fully perform. It seems to us the court below was right in this construction of the contract, and that a full performance was not an essential condition to the defendant's right to a lien upon such logs as he got out under the contract.

But it is further insisted, that if the defendant had a lien, he waived and released it; first, by delivering possession of the logs to the plaintiff; and second, by an agreement subsequently made.

Where the lien is given by law, the doctrine is well settled, that a voluntary surrender of the possession is deemed a waiver. In this case, however, the lien is created by express contract as well as by statute. The language of the contract is: "And it is hereby expressly agreed between said *Scott* and said *Smith*, that said *Scott* shall have and hold a lien in and on the entire logs cut and run as aforesaid, and may retain in his possession the entire logs so cut and run until he shall be paid in full for all sums that may be due him on this contract for cutting and running said *Smith's* half of said logs at the price aforesaid, and all other expenses incurred by said *Scott* on said logs under this contract." The contract also further provided, that, after the logs were all rafted and ready to be delivered and paid for, the same should be divided by raft, quality and quantity considered, in order that each party might have an equal amount. This division was made. There was no evidence whatever that the defendant voluntarily surrendered possession of the plaintiff's half with the intention of discharging the lien; and the court directed the jury that the fact that the parties divided the logs did not discharge it. The court also charged that the defendant did not lose his lien by any change of possession, nor by reason of his failure to perform the contract on his part, and that the lien would only be discharged by some agreement between the parties for a discharge.

The intention is very manifest from the contract, to continue the lien upon the logs until the amount due the defendant was paid. The plaintiff was to have the right of selling his undivided half at any time, subject to the liens and claims of the defendant. But the lien was to continue after the sale until the defendant was paid. There is really no evidence that the defendant voluntarily parted with the possession of the plaintiff's portion of the logs with the intention of relinquishing his lien. Some acts of the defendant are relied on to show a waiver; but to our minds they are entirely consistent with the presumption that he intended to insist upon his rights under the contract. The lien was clearly and expressly given by the agreement, and, although a division was made, yet there is no proof that upon that division the defendant surrendered the possession with the intention of relinquishing it. On the contrary, the proof is very clear that the defendant always claimed his lien, and insisted upon his rights under the contract.

It is said that by the terms of the subsequent agreement made with reference to the Mud Lake logs sold to the defendant, the plaintiff was to have his share of the Shioc logs on the division discharged of lien. We do not so understand that arrangement. The amount due the plaintiff upon the sale of the Mud Lake logs to the defendant for $9 per thousand feet, was to be applied in payment of the lien on the Shioc logs. This is the language of that subsequent agreement, as written by the plaintiff himself. Now what was the amount due the plaintiff on the sale of the Mud Lake logs? Was it the value of one-half of those logs computed at $9 per thousand feet; or was it the amount coming to him after the lien of the defendant upon those logs had been discharged? Manifestly, as it seems to us, it was the latter sum. The charges and claims of the defendant for putting in those logs were made liens by the contract, and whatever would be coming to the plaintiff after paying those liens would be the amount due upon the Mud Lake logs. It would be a most unnatural and forced construction of the

language, to say that the defendant agreed to apply the full value of one-half of the Mud Lake logs in payment of the lien on the Shioc logs — thus abandoning his claims on the former lot, so clearly secured to him by the contract. There is certainly nothing in the language of the writings, and nothing in the circumstances surrounding the transaction, which would warrant any such assumption. The parties were dealing with each other with full reference to their rights under the contract. And when they stipulated that the amount due the plaintiff on the Mud Lake logs, was to be applied in payment of the liens on the Shioc logs, they manifestly referred to the balance due him after deducting the charges of the defendant on the former lot. For what was coming to the plaintiff, by the terms of the contract, on the Mud Lake logs, after deducting the charges upon them for getting them out and rafting them, was the amount due him. And this amount it was mutually agreed should be applied in payment of the liens upon the other lot, and there is no pretense that the plaintiff did not have credit for this sum. The amount due him upon the Mud Lake logs sold to the defendant for $9 per thousand feet was applied according to agreement. The circuit court placed this construction upon the written contract; and as it appears to us, it was the only construction which could properly be given to it. It is assumed by the counsel for the plaintiff that the written contract was a little obscure upon this point, and that the intention of the parties was made plain by the explanation given by the plaintiff on the trial. But to our minds the meaning of the written contract is clear and unambiguous. And it was, that the amount due the plaintiff on the sale of his half of the Mud Lake logs, after deducting the charges upon them, was to be applied towards the payment of the amount due the defendant for getting out the Shioc logs; and that amount was so applied. And we therefore think there was no evidence to go to the jury upon the questions, whether the defendant's lien upon the Shioc logs had been discharged

in full before the alleged conversion ; or whether he had waived it by voluntarily surrendering the possession of these logs to the plaintiff with the intention of releasing it. And if the jury had found that the defendant had been paid his lien on the logs in controversy by the arrangement made about the Mud Lake logs, or that he had voluntarily abandoned his lien, it would have been the clear duty of the court to set the verdict aside as unsupported by the testimony in the case.

The next question is, Did the defendant lose his lien by his delay in enforcing it? We see no ground for saying that there was any unreasonable delay on the part of the defendant in selling the logs. By the contract, after the logs were ready for delivery, if the plaintiff did not, within three weeks after notice, pay the amount due the defendant for cutting, banking and running the logs, then the defendant was to proceed and sell a sufficient quantity to pay all sums which might be due him. It seems the notice was given the last of October, 1869, and the plaintiff was informed of the amount claimed by the defendant to be due on the logs. After waiting the requisite time, the defendant advertised the logs for sale, but could get no satisfactory bid for them at public sale. He likewise tried to sell them at private sale, but was unable to do so until the month of March following, when he sold upwards of 200,000 feet to Spencer Mowry for $7.00 per thousand. But it does not appear that the defendant was wanting in proper diligence in enforcing his lien, or that the plaintiff sustained any loss by the delay. The defendant testified that the best offer he could get for the logs was $6.00 per thousand, previous to his sale to Mowry. It is conceded that the defendant could not unreasonably keep the logs to the plaintiff's loss, and there is no evidence tending to prove that he did so. He seems to have acted as promptly as possible, and sold the logs as soon as he could without too great a sacrifice on their value.

The last objection is, that the defendant was guilty of a conversion by selling more logs than was necessary to satisfy his

lien, and that as to the overplus or excess the plaintiff was en-· titled to recover. The logs were sold in the raft. It appears that two rafts were insufficient to satisfy the claim of the defendant, and he sold a third raft entire, which was more than enough to discharge that claim. On the part of the defendant it is insisted that he was under no obligation to take the risk of breaking a raft so as to get out just logs enough to satisfy his lien, but had a right to sell the property in the form in which that kind of property was ordinarily and usually sold, even if by so doing something over the amount of his claim was realized. There was evidence tending to show that logs were usually sold in the market at Oshkosh in rafts; and the court instructed the jury that if they were satisfied from the testimony that this was the usual and ordinary method of selling that kind of property, and that two rafts were insufficient to pay the whole claim of the defendant, then he would have the right to sell a third raft, notwithstanding there might be more than enough in the third raft to satisfy the defendant's lien; and that as to the excess he would not be guilty of a conversion. It seems to us that this was a proper direction as to the law applicable to the case. True, the contract authorized the defendant, in case he was compelled to make sale, "to sell a sufficient amount to pay all sums" which might be due him; but this authority to sell should be construed with reference to the nature of the property and the usual way of selling the same in the market where the parties contemplated the sale to take place. If logs in the Oshkosh market were generally sold in rafts, had the defendant divided a raft and the plaintiff sustained a loss in consequence thereof, he might well have complained of the irregularity in making the sale. As it is, there is no ground for saying that the defendant was guilty of a violation of duty in selling the logs in rafts in the way they are ordinarily sold in that market.

It follows from these views that the judgment of the circuit court is correct and must be affirmed.

*By the Court.*— Judgment affirmed.